UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
EDWARD URENA,

        Petitioner,

-against-

WILLIAM PHILLIPS, Superintendent,

        Respondent.

---------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. CV-04-5587(FB)(JMA)

*Appearances:*
*For the Plaintiff:*
EDWARD URENA, *Pro Se*
01-A-2400
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582

*For the Defendant:*
CHARLES J. HYNES, Esq.
District Attorney, Kings County
By: JODI L. MANDEL, Esq.
Assistant District Attorney
350 Jay Street, 20th Floor
Brooklyn, NY 11201

**BLOCK, District Judge:**

        Petitioner Edward Urena ("Urena") seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 following his conviction in New York Supreme Court, Kings County, on one count of murder in the second degree and two counts of weapons possession. Urena's petition claims that he was denied his due process rights under the Fifth and Fourteenth Amendments by (1) the prosecutor's alleged misconduct during summation and (2) the jury's experimentation with the murder weapon during deliberations. Respondent does not dispute that Urena exhausted both claims in state court, but asserts that the claims were rejected on independent and adequate state grounds and are therefore procedurally barred.

1

For the reasons set forth below, the Court addresses Urena's claims on their merits but denies the petition.

I.

Urena's conviction stems from the May 6, 2000 shooting death of William Acevedo ("Acevedo"), outside a social club in Brooklyn, New York. At the trial, prosecution and defense witnesses presented contrary versions of the events surrounding the shooting. Three eyewitnesses testified for the prosecution that following an argument earlier in the evening between Acevedo and a group of individuals including Urena, Urena approached Acevedo, who was unarmed at the time, and shot him several times with a semi-automatic handgun. According to one of the witnesses, Urena then fled the scene in a getaway car occupied by three other people. The prosecution also presented the testimony of a ballistics expert, who instructed the jury on the functioning of the handgun that was retrieved from the crime scene and matched to the six shell casings found near Acevedo's body. During his testimony, the expert demonstrated how the gun's user was required to cock back the slide in order to fire the first bullet from the clip, and estimated that operation of the gun's trigger required application of approximately 8 ½ to 10 pounds of pressure. The expert also testified that the position in which the gun's slide had been found indicated that the gun's clip had been emptied when fired.

Urena's defense consisted primarily of his testimony, corroborated by that of a second eyewitness, who was a friend of Urena, that Acevedo had threatened Urena with a knife and that Urena had killed Acevedo in self defense; however, no knife was recovered from the scene of the shooting. Urena also testified that he had never handled or fired a gun before the day of the shooting, and that he had taken temporary possession

2

of the murder weapon in order to prevent the escalation of a confrontation between Acevedo and a third companion who was also present at the time of the shooting. Urena further testified that when Acevedo approached him with the knife, he was able to cock the gun at his companion's instruction and, although he did not remember pulling the trigger more than once, then fired a number of rapid shots.[1] According to Urena, he immediately fled the scene alone.

During summations, defense counsel called the credibility of the prosecution's witnesses into question, and repeated Urena's assertion that he had never handled a gun before the day of the shooting. Defense counsel also told the jury that Urena was firing wildly in self-defense and had emptied the gun because it would have been impossible at the time for him to stop firing; he pointed to testimony that the shots had been rapidly fired as evidence that Urena was in a crisis situation at the time and had reacted accordingly.

In its closing argument, the prosecution attacked Urena's assertions that he had never used a gun before and did not intend to empty the firearm, arguing that Urena had "expertly maneuvered and manipulated" the weapon, and that given the amount of pressure required to pull the trigger, Urena could not have unintentionally fired the gun six times, as he suggested. Tr. at 604.[2] In the course of making this argument, the prosecutor used the gun, which had been admitted into evidence, to demonstrate both the position in which the gun's slide was found, and the manner in which the gun was

---

[1] This individual did not testify at trial; the record suggests that he left the country following the shooting.

[2] References to "Tr. ___" are to the transcript of the state court trial proceedings.

required to be cocked before it could be fired. In asking the jury to evaluate the credibility of Urena's version of events, the prosecutor requested the members of the jury who had no experience with firearms to ask themselves whether they would have been able to cock the gun under similar circumstances. The prosecutor then stated:

> Pick the ones among you who have the least experience with guns and ask if they would know how to do this and then go into the jury room and do it yourself. Ask for this gun. Feel how much pressure it would take for you to pull this trigger. I do it a little easier because I personally have experience with weapons.

Tr. at 638. In response to defense counsel's objection, the trial court instructed the jury,

> [w]hether or not he has experience doesn't matter. But the point is it might not be as easy to do the first time, whether or not you've done it before. [The prosecutor's] point is he's done it before. He would like someone who has never done it before to try it.

Id.

During his summation, the prosecutor also stated on four occasions that the defense's eyewitness had lied; the court overruled defense counsel's objection on two occasions, instructing the jury on the first occasion that the prosecutor was making a comment on the evidence and that the jury could accept or reject that assertion; the court did not respond to defense counsel's third objection. At defense counsel's request, the trial court interrupted the prosecutor's closing argument on a separate occasion to instruct the jury that the credibility of the witnesses was for it to decide, and that the jury was not bound to accept any witness's testimony as credible; the trial court also admonished the prosecutor that he could not vouch for the credibility of the prosecution's witnesses. In addition to the foregoing instructions, the trial court twice instructed the jury at the outset

4

of the trial that statements and arguments by the attorneys were not evidence and that the attorneys were not allowed to give the jury their personal opinions about whether the witnesses were telling the truth; the court also informed the jury that "you are not going to decide this case based on what they tell you they think about it. You have to make up your own mind what you think about all these things." Tr. at 11. Finally, during its charge, the court instructed the jury that although the lawyers had commented on the evidence during summations and suggested certain inferences or conclusions that might be drawn from that evidence, the summations themselves were not evidence.

During deliberations, the jury sent out a note requesting to see the murder weapon. Both sides agreed with the court's decision to inform the jury in response that the gun would be sent in, but that the jury would be required to send out another note if it wanted to remove the weapon from the evidence bag; in this event a court officer would be placed in attendance while the jury handled the weapon, and the jury would not be allowed to deliberate in the officer's presence. Without objection from defense counsel, the court also agreed with the prosecutor's suggestion that the court not reconvene if the jury subsequently asked to remove the weapon from the bag. After the gun was sent in to the jury, the jury requested to remove the gun from the bag; the request was accommodated pursuant to the directions previously agreed upon by the parties. Later the same day, the jury returned a verdict convicting Urena of second degree murder and two counts of weapons possession; Urena was sentenced to concurrent terms of 21 years to life on the murder count, 15 years on the first weapons count, and 7 years on the second weapons count.

On appeal, Urena argued that his due process rights had been violated by the

prosecutor's summation, in which the prosecutor (1) stated that the defense witness lied; (2) became an unsworn witness by demonstrating the functioning of the weapon, (3) presented himself as an expert to the jury; and (4) invited the jury to conduct an improper experiment with the weapon. Urena also argued that the record demonstrated that the jurors had accepted the prosecution's invitation to experiment with the weapon, and that in doing so the jurors introduced non-record evidence into the deliberative process and became unsworn witnesses against Urena, thereby violating his right to a fair trial. The Appellate Division affirmed Urena's conviction, ruling that his "claim that statements made by the prosecutor during summation constituted reversible error is not preserved for appellate review"; the court found that Urena's "remaining contentions [were] either unpreserved for appellate review or without merit." *People v. Urena*, 305 A.D.2d 433, 433 (2d Dep't 2003) (citations omitted). Leave to appeal to the Court of Appeals was denied on August 8, 2003. *See People v. Urena*, 100 N.Y.2d 600, 600 (2003). Following an unsuccessful motion before the trial judge to vacate his conviction pursuant to N.Y.C.P.L. § 440.10, Urena filed the present petition, asserting the claims raised and rejected on direct appeal.

## II.

### A. Standards of Review

Only federal issues may be raised on *habeas* review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). A federal court may not review a state prisoner's *habeas* claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of law, or demonstrate that failure

6

to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). When a state court "says that a claim is 'not preserved for appellate review' and then rule[s] 'in any event' on the merits, such a claim is not preserved," *see Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996); by contrast, when a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review *or* without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000) (emphasis added).

The degree of deference to be given to disjunctive state-court holdings is "anything but clear," *Shih Wei Su v. Filion*, 335 F.3d 119, 126 and n.3 (2d Cir. 2003) (comparing *Ryan v. Miller*, 303 F.3d 231, 246 (2d Cir. 2002) (giving AEDPA deference) with *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (declining to give AEDPA deference)). Until it is resolved by the Second Circuit, this potentially thorny issue can be avoided if the claim can be denied on *de novo* review. *See, e.g., Robinson v. Ricks*, 2004 WL 1638171 at *8, n.8 (E.D.N.Y. July 22, 2004) (declining to decide whether AEDPA deference applied "because [petitioner's] claim . . . fails even under a *de novo* standard of review.").

**B. Urena's Claims**

**1. Prosecutor's Summation**

On direct review, the Appellate Division held that Urena's claim that he was denied his right to a fair trial by reason of statements made by the prosecutor during summation was "not preserved for appellate review." *People v. Urena*, 305 A.D.2d at 433. Because failure to comply with the state's rule requiring contemporaneous objection to alleged trial errors is an independent and adequate state ground which precludes federal

*habeas* review, *see Garcia v. Levine*, 188 F.3d 71, 79 (2d Cir. 1999), Urena must demonstrate cause for the default and actual prejudice, or demonstrate that "failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. Urena has not alleged, or attempted to demonstrate, cause and prejudice or a fundamental miscarriage of justice. In any event, the claim would fail on its merits even under a *de novo* review because the prosecutor's summation did not deprive Urena of his right to a fair trial.

"[I]t is not enough that the prosecutors' remarks [during summation] were undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 180 (1986) (citations and quotation marks omitted). The relevant inquiry is whether the "comments so infected the trial with unfairness as to make the resulting conviction a denial of due process"; in conducting this inquiry the prosecutor's comments must be examined to "determine their effect on the trial as a whole." *Id.* at 180, 182. In deciding whether this standard has been met, the Second Circuit has "considered the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir. 1998) (citations and quotation marks omitted).

Urena contends that the prosecutor's summation was fundamentally unfair and denied him of due process because the prosecutor (1) invited the jury to conduct an improper experiment with the murder weapon; (2) stated that the defense eyewitness lied; (3) became an unsworn witness by demonstrating the functioning of the weapon; and (4) presented himself as an expert to the jury. The Court disagrees.

With respect to Urena's first contention, the Court concludes, as discussed

8

below, that the jury's experiment did not violate Urena's due process rights; therefore, the prosecutor's suggestion during summation that the jury conduct that experiment did not deprive Urena of a fair trial.

With regard to Urena's second contention, "'the use of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory.'" *Floyd v. Meachum*, 907 F.2d 347, 354 (2d Cir. 1990) (citing *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987)). Here, the case turned in large part on the jury's evaluation of the credibility of the numerous witnesses who testified, and while the prosecutor's assertions that the defense eyewitness lied may have been improper, they did not constitute severe misconduct on the prosecutor's part. The references were brief and isolated, and any negative effect was further counteracted by the trial judge's curative instructions during the summation that it was the jury's job to judge the credibility of the witnesses and to accept or reject the prosecutor's assertions, as well as its general instructions, repeated on several occasions during the course of the trial, that the attorney's statements were not evidence.

With respect to Urena's third contention, while the Court believes that it was improper for the prosecutor to suggest to the jury that he had expertise in firearms, this was an isolated comment which was immediately corrected by the trial judge's instruction to the jury to disregard whether or not the attorney had any experience with guns. *Cf. Tankleff*, 135 F.3d at 253 (finding that prosecutor's reference on two occasions during summation to fact that defendant's sister did not testify were "short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict," and that while the

9

judge should have given a specific curative instruction, the pattern instructions given by the trial court were "probably sufficient to cure any harm the prosecutor's misstatements may have caused").

With respect to Urena's fourth contention, the prosecutor's demonstration of the gun's functioning to the jury was merely repetitive of the demonstration given by the prosecution's ballistics expert, as well the expert's testimony regarding the amount of pressure required to pull the weapon's trigger. Consequently, the demonstration was an acceptable comment on admitted evidence. Furthermore, even if it may arguably have been improper for the prosecutor to conduct the demonstration or to argue that Urena could not, as a novice, have easily cocked the gun or accidentally pulled the trigger numerous times, the Supreme Court in *Darden* explained that in determining the effect of any improper comments on the trial as whole, it is proper to consider whether particular comments were "invited by or responsive to the opening summation of the defense." 477 U.S. at 182. *See also Gatto v. Hoke*, 809 F. Supp. 1030, 1040 (E.D.N.Y. 1992) (finding that statements in prosecutor's closing did not deprive petitioner of a fair trial because they were a "fair response to arguments advanced by petitioner's counsel in his summation"). In the present case, the defense counsel argued in its summation that Urena had no experience with weapons and had fired the gun wildly without intending to empty the clip. Therefore, the prosecutor's request that the jury evaluate the credibility of the defense theory by examining the physical and testimonial evidence introduced at trial, including evidence regarding the gun's operation, was made in response to a version of events advanced by Urena himself. Moreover, any harm that may have resulted from the prosecutor's demonstration was ameliorated by the trial court's instructions to the jury that

the statements and arguments made by the attorneys during summation were not evidence.

Finally, the Court notes that the weight of the evidence against Urena – including the testimony of three eyewitnesses who stated that Acevedo was unarmed when Urena approached and shot him, and that no knife was ever recovered from the crime scene – "was heavy," and "reduced the likelihood that the jury's decision was influenced by [any improper] argument." *Darden*, 477 U.S. at 182. This is not a case "in which the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury." *Tankleff*, 135 F.3d at 253.

### 2. Jury Experiment

Because Urena's claim that he was denied a fair trial by the jury's allegedly improper experiment involving the murder weapon was rejected by the Appellate Division on direct appeal as "either . . . unpreserved for appellate review or without merit," *People v. Urena*, 305 A.D.2d at 433, it will be reviewed *de novo*. *See Shih Wei Su*, 335 F.3d at 126 & n.3.

Although the Second Circuit does not appear to have addressed the precise question of when a jury experiment will implicate a defendant's right to a fair trial, it has generally held that jurors' consideration of facts not in evidence can violate a defendant's due process rights. *See, e.g., Bulger v. McClay*, 575 F.2d 407, 412 (2d Cir. 1978) (affirming grant of *habeas* where information about defendant's address, which was not made part of the trial record, was discovered from a newspaper article and discussed during jury deliberations as fact that rendered defense implausible); *see also U.S. v. Simmons*, 923 F.2d 934, 943 (2d Cir. 1991) (noting that the Sixth Amendment protects against "extra-record

infiltration of jury deliberations"). Even where extra-record information is considered by a jury, however, *habeas* relief is not warranted unless the violation was prejudicial. *See Simmons*, 923 F.2d at 944; *see also United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970) (citations and quotation marks omitted) (holding in *habeas* case that "[t]he touchstone of decision in a case [where the jury considers factual material not properly before it] is . . . not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice. . . . [Where] there [is] such a probability that prejudice will result . . . [the verdict] . . . is deemed inherently lacking in due process.").

Cases outside the Second Circuit have analyzed jury experiments conducted outside the jury room, or experiments that involve the introduction of extrinsic evidence into deliberations, under a similar rubric, holding that such experiments may violate a defendant's constitutional rights if the petitioner can show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Doan v. Brigano*, 237 F.3d 722, 736 (6th Cir. 2001); *see also Durr v. Cook*, 589 F.2d 891, 892 (5th Cir. 1979) (holding that jury foreman's out-of-court experiment to test defendant's self-defense theory merited an evidentiary hearing to determine whether experiment substantially influenced jury's verdict, thereby violating defendant's constitutional rights); *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) (holding that out-of-court experiment conducted by individual juror, involving second individual who was not a member of the jury and using handgun belonging to that individual, may implicate a defendant's constitutional rights if the experiment substantially influences jury's verdict).

12

However, in examining the propriety of jury experiments, courts have also held that "[j]urors must be given enough latitude in their deliberations to permit them to use common experience and illustrations in reaching their verdict," and that "[a] simple experiment based solely on evidence introduced at trial" does not violate a defendant's constitutional rights. *Kurina v. Thieret*, 853 F.2d 1409, 1413-14 (7th Cir. 1988) (concluding that juror's use of cardboard knife to re-enact crime did not deprive defendant of a fair trial). "A review of the case law dealing with juror experiments... suggests that where the jurors are not informed of extra-record *facts* but merely observe an experiment in the jury room 'testing' certain of the record evidence, their verdict is not constitutionally defective." *Simon v. Kuhlman*, 549 F. Supp. 1202, 1206 (S.D.N.Y. 1982). *See also United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983) (holding that defendant was not deprived of a fair trial where in testing defense theory jury used physical evidence to recreate defendant's actions, because jury was not exposed to any extraneous materials during their deliberations); *Bogle v. Galaza*, 2002 WL 464591 at *1 (9th Cir. Mar. 21, 2002) (holding that jury's action in considering the result of its attempt to insert a key into the lock of a safe, both items being in evidence, "did not constitute an impermissible jury experiment or the consideration of extrinsic evidence, because a jury is permitted to examine all pieces of evidence carefully, ... and to reenact the crime using the evidence before it." (citing *United States v. Rincon*, 28 F.3d 921, 926-27 (9th Cir. 1994); *Avery*, 717 F.2d at 1026)).

The experiment that allegedly occurred in this case merely involved the examination of an item already in evidence, whose functioning had been demonstrated by the prosecution's expert witness while under oath, and which did not seek to inject evidence or facts not part of the record at trial into the jury deliberations. The experiment

13

was therefore not improper and did not implicate Urena's due process rights. Moreover, even if it were determined that the experiment somehow introduced extrinsic evidence into the deliberations, Urena would not be entitled to relief unless he could demonstrate that the introduction of such evidence was prejudicial. Even assuming that the jury improperly examined the handgun and concluded that Urena was not credible in asserting that he had never handled a handgun before the day of the shooting and could not have accidentally fired all shots in the weapon's clip, the Court cannot conclude that this determination was prejudicial in light of the strong evidence that the shooting was not done in self-defense, including the testimony of three eyewitnesses that Urena deliberately shot the unarmed victim, and that no knife was recovered from the crime scene.

### III.

Urena's § 2254 petition is denied. Because Urena has failed to make a substantial showing of the denial of a federal right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

FREDERIC BLOCK
United States District Judge

Brooklyn, NY
January 6, 2006